IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 19, 2016


**STATE OF TENNESSEE v. DOUGLAS CURTIS**


**Appeal from the Circuit Court for Lewis County**
**No. 2012CR6     James G. Martin, III, Judge**

_____


**No. M2015-01372-CCA-R3-CD – Filed August 26, 2016**

_____


The defendant, Douglas Curtis, was convicted of four counts of rape of a child, a Class A felony. On appeal, he contends that the evidence is insufficient to support his convictions and that a portion of the victim's testimony violated his right to a fair trial. Following our review, we affirm the judgments of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

Larry Joe Hinson, Jr., Hohenwald, Tennessee (at motion for a new trial and on appeal), and John S. Colley, Columbia, Tennessee (at trial), for the Appellant, Douglas Curtis.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Kim Helper, District Attorney General; and Jennifer Mason, Assistant District Attorney General, for the Appellee, State of Tennessee.


**OPINION**

**FACTS AND PROCEDURAL HISTORY**

This case arose after the victim, who was twenty-nine years old at the time of trial, came forward with allegations that the defendant, her father, raped her when she was a young girl. The victim testified that she was born December 27, 1985.

The State's evidence came primarily from the testimony of the victim and a recorded telephone call. In the summer of 2011, the victim was living with the defendant, her brother, and her sister. At that point in time, she had been attending a church for almost a year and had developed a close relationship with the pastor's wife, Debbie Landers. During the summer, the victim witnessed an event that caused her to have concern for another individual. She asked Ms. Landers for advice, and Ms. Landers testified that she told the victim that the victim had to report the incident. Ms. Landers recommended that the victim contact the Department of Children's Services ("DCS"), the sheriff's department, or the city police. The victim contacted DCS and the Child Advocacy Center ("CAC"), and the CAC directed her to Investigator Johnny Hilburn of the Lewis County Sheriff's Department. She went to speak with Investigator Hilburn about the incident, and he testified that based on his conversation with the victim, he began to believe that she was a victim of abuse herself. Investigator Hilburn asked the victim if there was anything in her past that she wished to discuss, and she stated that she was touched by her father. The victim testified that prior to speaking with Investigator Hilburn, she had not contacted law enforcement regarding the defendant.

The victim testified about four instances of sexual abuse that the defendant committed against her. The first incident happened on February 14, 1998, when she was twelve years old. At that time, the victim and the defendant had "a very close relationship." The defendant allowed her to stay up late to watch television with him while her siblings had to go to bed, and she received privileges and gifts that her siblings did not. On Valentine's Day, the defendant gave the victim a bear, and she stayed up late to watch television and "hang out with" the defendant. Her mother, brother, and sister were each asleep in their bedrooms. The victim testified that the defendant went into his office and laid down a blanket. He returned to the victim and asked her if she "wanted to mess around." The victim "shrugged [her] shoulders," and the defendant took her by the hand and led her to the office. She lay down, and the defendant began to touch her body. She testified that the defendant rubbed his fingers across her vagina and digitally penetrated her vagina. Once he was finished, he picked up the blanket and went to bed. The victim testified that she went with the defendant to the office because she loved him and "felt special" and "wanted to do what he said."

The victim testified that a second, similar incident also occurred in 1998, when she was twelve years old. She recalled that she had finished the sixth grade and had recently made the cheerleading squad. She was staying up late with the defendant, and he congratulated her on making the cheerleading squad. The defendant then "disappeared and went into the office and laid down a blanket, came back and asked [her] if [she] wanted to mess around." She shrugged her shoulders and went with him to the office. She lay down, and the defendant touched her body. He touched her chest and then touched the outside of her vagina, eventually digitally penetrating her vagina.

2

A third incident occurred in July of 1998 when the defendant made her perform oral sex on him. The victim distinguished this incident from the previous two incidents because she recalled that it occurred on the defendant's birthday. The defendant and the victim were staying up late watching television when the defendant "disappeared to put the blanket down in the office." He returned and asked the victim if she "wanted to mess around." She shrugged her shoulders and went with him to the office. She testified that the defendant was wearing a bathrobe, and "he pulled it apart at the bottom and asked if he got something special." He sat the victim down beside him and "caressed [her] back and hair area." The defendant placed his hand on the victim's head, directing her head toward his penis. The victim placed her mouth on the defendant's penis, and he "guided [her] head up and down." The defendant then lifted the victim's head up and ejaculated onto his stomach. The defendant cleaned up the ejaculate with a blanket that was on the floor, and he placed the blanket in the washroom. The victim recalled that the defendant told her that "he wanted to be the one to show [her] the right way to do these things, he wanted to be the one to show [her] how to treat a man." On cross-examination, the victim stated that this incident occurred in her bedroom on her futon.

The fourth incident occurred on a date between February 7, 1997, and December 26, 1998. The victim testified that during these dates, the defendant drove a church bus that would pick up the elderly and children and take them to church on Wednesday nights. One Wednesday night, the victim accompanied the defendant. After they had dropped off the parishioners and were alone in the van, the defendant asked the victim if she wanted to mess around. He used his hand to direct the victim to his penis, and she put her mouth on his penis. After this incident, the victim told the defendant that she did not want to do these things any longer because it made her "feel disgusting."

During the summer between the victim's eighth and ninth grade years, the victim's parents separated, and the defendant moved to Florida. Each child went to visit him separately, and the victim went first. Eventually, the victim, her mother, brother, and sister all moved to Florida, but the defendant and his wife could not reconcile. The family moved back to Tennessee, and the defendant and the victim's mother divorced when the victim was in the tenth grade. The victim's mother, brother, and sister moved to Tullahoma, Tennessee. The victim lived with the defendant in Hohenwald, Tennessee, and she testified that she did so voluntarily. The victim continued to have a relationship with the defendant during her high school and college years, and she described the relationship as "a very husband and wife kind of relationship." She testified that she continued to visit and live with the defendant in college because she "loved him and he was [her] dad." She testified that she loved the defendant at the time and cared about him. She explained that she waited so long to disclose the abuse because she could

3

"forgive and forget," but seeing someone else suffering abuse prompted her to contact authorities.

After disclosing the abuse to Investigator Hilburn, the victim participated in a "perp phone call" with the defendant, which was a controlled telephone call that Investigator Hilburn recorded. The victim testified that she was reluctant to make the phone call because she did not "want to betray" the defendant. Investigator Hilburn directed the victim to ask the defendant about allegations of sexual abuse against a second child, and he scripted several questions for the victim to ask the defendant. One particular question was what made the defendant "sexually attract[ed] to an eight-year-old." The recorded phone call was played for the jury, and we have included the relevant portions of that conversation:

> Victim: [A child][1] said that you touch her, like you did when I was a kid, like touch her.
>
> Defendant: No, that's bullcrap.
>
> . . .
>
> Defendant: I have never touched that child except to give her a bath . . . .
>
> Victim: I cannot believe that. I cannot believe it. I'm sorry.
> . . .
>
> Defendant: I promise you that's not going on. You just don't know how many times I want to kill myself over the other deal already. And it's not going to happen again.
>
> . . .
>
> Victim: Can I ask you why you did it to me?
>
> Defendant: Well you know why.
>
> Victim: No, I don't.

---

[1] The defendant's strategy at trial was to attempt to question the authenticity of the recording, and as a result, the defendant chose to allow the references to a second victim. The State presented expert testimony that the recording was authentic and had not been edited.

. . .

Victim: After all these years, I still don't know.  I need that closure.

Defendant: Well like I said, I know, I know the damage that was done there, I, you know, I never will forgive myself for that.  You know, you just don't know.

Victim:  I don't think you know the damage that was truly done.  How I grew up just hating you so much. . . . I've truly forgiven you inside, but it's so hard to forget.

Defendant: I know that.  And if there is anything I could do to change it, I would.  But as far as [the child], there's nothing like that going on and there never will be.

. . .

Victim:  I really need to know . . . why.  Honestly . . . what makes you think it's okay to do that though?  To have sex with a little girl? A twelve-year-old girl.

Defendant:  It wasn't right.

Victim:  Then why did you do it, Daddy?

Defendant: I have no answer for that other than I loved you and I'm [unintelligible] stupid.  And I still love you to death, you know that.

. . .

Victim: So you thought it was okay to show your love like that?

Defendant: In a way, at the time I did.  And of course I have regrets about it.  I've told you.  And if there was anything I could do to turn back time, it never would have happened.

. . .

Defendant: I've told you before, you know, unfortunately, you're the only person that I ever even crossed the line, and I don't know why.  Like I said,

I love you, and I just made a stupid, stupid, stupid mistake, you know? But, I don't know, that's why when -- I know when you came back to live at home you was worried about that too, and that's why I've not even, you know, tried to make you act or see things any different than a father-daughter relationship, and that's maybe, I guess it's too late for that now. But that's--I wish, in my heart, that's what I want, you know?

Victim:  . . . I can never have that love that I wanted for a father, and it hurts my heart so bad.

Defendant: I wish you had told me way back then, you know?

Victim:  I did! Do you not remember me telling you, I wanted stop because I felt gross?  And you just wouldn't.  You didn't.  You cried, and it made me feel bad for wanting to stop.

Defendant:  Well, just that one time you did, yeah. And then, after that, you never said nothing else to me.  When we moved back here and everything, you never said a word to me.  I guess in my unreality of the whole thing, I thought you were happy too.

Victim: What, what -- I want to know one more thing.  At eight years old, okay, what, just let me, I don't know what made you attracted to me at eight years old, like, I don't know.

Defendant:  You weren't eight.

Victim: How old was I?

Defendant:  Like I said about twelve.  Eleven, twelve.

. . .

Defendant: To me, what we had in my stupidity and idiotic self was special, you know?  I -- I never touched your brother or your sister, and it's not like I'm just a pervert running around, you know, molesting kids or whatever. You know what I'm saying?  It's just not that way.  And I'm sorry that -- that it happened to you, and I don't know what else to say to you.  I tried to make up for it any way I can, but I know I can't, and I try to make the best of a bad situation, if that makes any sense.  I try and make you feel as comfortable as possible, you know. Because I -- I do know, because I-- you

don't know what I've been through either.  It's a two-way thing there.  I'm sure it's worse on you, but it's still -- it's bad on me too.

Victim: Alright.

Defendant: And I was hoping you did forgive me, and the way you've been acting, you did forgive me.  And I was just hoping that it was a mistake that was gonna go away. That you could see me as your dad and nothing more, and just really be your daddy, you know.

Victim: I've never looked at you and not seen that person.  Not once have I ever looked at you and thought, this is my sweet Dad that I love so much.  Not one time, Dad.

Defendant: Well, I don't know what to say about that either.  I deserve it.

Victim: Alright.

Defendant: But I wish you would forgive me. . . .

Victim: Alright.

. . .

Defendant: And I really am--I really am sorry . . . .  You just don't know how sorry I am and how much hurt I've been through as well, and it all revolves around did I hurt you.  I'm--I know, you know, you may not think I know, but I know.

Shortly after the phone call, Investigator Hilburn briefly met with the defendant.  The next day, he interviewed the defendant and informed him that the victim had made allegations against him.  The defendant told Investigator Hilburn that the victim was upset with him and likely retaliating over a situation that occurred a week prior to the interview.  Investigator Hilburn asked the defendant if he had received a phone call from the victim the previous day.  The defendant replied that he received numerous phone calls from the victim, and Investigator Hilburn asked him if he remembered a particular conversation and how he would respond if he knew that conversation was recorded.  The defendant answered that he did not know what conversation Investigator Hilburn was referring to, and he denied that he was the person on the recording after Investigator Hilburn played him portions of the call.  Investigator Hilburn received permission to examine the defendant's cell phone, and he saw that there was a call from the victim's

phone number that matched the time and duration of the recording. The defendant responded that he did not receive a phone call from the victim or speak to her at that time. Investigator Hilburn testified that he had interacted with the defendant prior to the phone call and was familiar with the defendant's voice. He said that the voice on the recording appeared to be the defendant's voice.

Investigator Hilburn agreed that his employment with the Lewis County Sheriff's Department was terminated after the conclusion of the investigation into the defendant for reasons unrelated to the investigation. He agreed that there were no references in his notes to the dates that the victim said the abuse occurred.

The victim testified that she paid her college tuition with college loans, and she used her uncle to co-sign one loan application. She testified that she received permission from her aunt to use her uncle as a co-signer, but she stated that she had not personally received permission from him to do so. She later learned that her uncle did not know about the loan and had not given her permission to use his name. She testified that she had not asked the defendant for money to help pay off the loan shortly before making the accusations against him. She also testified that after graduating from college, she worked for a mental health facility as a caseworker, and she was fired for violating company policy.

The jury convicted the defendant of four counts of rape of a child as charged. The trial court denied his motion for new trial, and he filed a timely notice of appeal.

## ANALYSIS

The defendant argues that the evidence is insufficient to sustain his convictions for rape of a child. The defendant also argues that his right to a fair trial was violated when the victim testified that she and the defendant had "a very husband and wife kind of relationship."

### I. Sufficiency of the Evidence

The defendant argues that the evidence was insufficient for the jury to find that the victim was under the age of thirteen when the abuse occurred. He contends that the only proof of the victim's age came through leading questions posed by the State, and he also contends that the State should not have been permitted to ask the victim leading questions. The State responds that the evidence is sufficient.

When a defendant challenges the sufficiency of the evidence, the relevant question for this court is "whether, after viewing the evidence in the light most favorable to the

State, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "'the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Therefore, this court will not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Instead, it is the trier of fact, not this court, who resolves any questions concerning "the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). "[A]lthough inconsistencies or inaccuracies may make the witness a less credible witness, the jury's verdict will not be disturbed unless the inaccuracies or inconsistencies are so improbable or unsatisfactory as to create a reasonable doubt of the appellant's guilt." *State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999).

A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court applies the same standard of review regardless of whether the conviction was predicated on direct or circumstantial evidence. *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011). "Circumstantial evidence alone is sufficient to support a conviction, and the circumstantial evidence need not exclude every reasonable hypothesis except that of guilt." *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012).

Tennessee Code Annotated section 39-13-522(a) (2010) defines rape of a child as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is more than three (3) years of age but less than thirteen (13) years of age." "'Sexual penetration' means sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's the defendant's or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7).

The defendant argues that the State should not have been permitted to ask the victim leading questions. Although the defendant raised the issue in his motion for new trial, counsel made no objection to leading when the State questioned the victim about the dates of the rapes during trial. *See* Tenn. R. Evid. 103(a)(1) (stating that a timely objection "stating the specific ground of objection" is required to preserve a claim that evidence was improperly admitted). As a result, this issue is waived, and we may only review it for plain error, which the defendant does not ask us to do. *See* Tenn. R. App. P. 36(a), (b) ("Nothing in this rule shall be construed as requiring relief be granted to a party

responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effects of an error" but allowing this court to review an issue for plain error).

This court considers five factors in determining whether plain error exists:

(a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994).

The existence of all five factors must be established to warrant plain error review. *Smith*, 24 S.W.3d at 283. If this court finds that one of the factors cannot be established, consideration of the remaining factors on appeal is unnecessary. *Id.* An error must be "of such great magnitude" that it probably affected the outcome of the trial. *Id.* (quoting *Adkisson*, 899 S.W.2d at 642). Only errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," will rise to the level of plain error. *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). This court has stated that "rarely will plain error review extend to an evidentiary issue." *State v. Ricky E. Scoville*, No. M2006-01684-CCA-R3-CD, 2007 WL 2600540, at *2 (Tenn. Crim. App. Sept. 11, 2007).

Prior to the hearing on the motion for new trial, the defendant switched attorneys, and his new attorney attempted to introduce evidence regarding the State's leading questions. At the hearing, trial counsel testified that he was aware that there were multiple acts of sexual abuse between the victim and the defendant that were not charged in the indictment and that the victim alleged that the abuse occurred almost daily. He explained that he had two strategic options: to try just the four counts and exclude evidence of all other acts of abuse, or to allow evidence of all the abuse and attempt to attack the victim's testimony as not credible. Trial counsel explained these options to the defendant, who instructed him to try just the four counts and attempt to exclude any references or testimony regarding the other acts of abuse. Trial counsel stated that he was afraid that if the State asked open-ended questions, the victim would reference incidents that the defendant was attempting to exclude from trial. Trial counsel testified that the only way to prevent this from happening was to allow "the State to specifically identify the incidents before that we elected to try." Trial counsel testified that he did not object

to the State's asking very direct questions of the victim because "the only way to keep her from blurting out or interjecting intentionally these other incidents that would have been so prejudicial to [the defendant] was to keep [the victim] focused with leading questions." Based on the testimony of trial counsel, the decision not to object to the State's leading questions was a tactical decision. As a result, the defendant cannot satisfy the second factor necessary for plain error review, and we conclude that plain error relief is not warranted.

Viewing the evidence in the light most favorable to the State, the victim described four specific instances of penetration involving the defendant that occurred when she was twelve years old. In the first, which she testified happened on Valentine's Day in 1998, the defendant penetrated her vagina with his fingers. She testified that a second, similar incident occurred after she made the cheerleading squad. She testified that on the defendant's birthday in 1998, he forced her to perform fellatio. In a fourth incident, she testified that the defendant forced her to perform fellatio while they were in a church van, and she told the defendant that she wanted the abuse to stop because it made her "feel gross." In the controlled phone call, the defendant admitted to sexually abusing the victim. He acknowledged the incident where she asked him to stop because it made her feel disgusting. He also corrected her when she said the abuse occurred when she was eight years old, saying that she was eleven or twelve years old when the abuse occurred. We conclude that there was sufficient evidence from which a jury could find that the defendant committed the offense of rape of a child.

## II. Victim's Testimony

The defendant argues that the trial court deprived him of his right to a fair trial by permitting the victim to testify that she and the defendant had a "very husband and wife kind of relationship" after she turned thirteen years old. According to the defendant, the statement suggests other rapes and constitutes testimony regarding a prior bad act. He contends that the testimony was not relevant and that any probative value was outweighed by the danger of unfair prejudice in violation of Tennessee Rule of Evidence 404(b). The State responds that the defendant has waived this issue and that he is not entitled to plain error relief.

At trial, the prosecutor asked the victim how she would describe her relationship with the defendant through her high school and college years. The victim responded that "[i]t was very close[;] it was a very husband and wife kind of relationship." The defendant made no objection to this answer. As a result, we may only review the issue for plain error, and as we stated above, the defendant must satisfy all five factors to merit plain error review. *See Smith*, 24 S.W.3d at 283.

11

We conclude that plain error relief is not warranted in this case. In order to be admissible, evidence must first be relevant. Tenn. R. Evid. 402. "'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Here, the victim's testimony was the result of a series of questions inquiring into the nature of her relationship with the defendant. The evidence was relevant to explain why she continued to live with the defendant for years after he sexually abused her. The defendant has not shown that a clear and unequivocal rule of law was breached, and he has not shown that consideration of the issue is necessary to do substantial justice. The victim's remark was fleeting, and there is no evidence that the State intentionally elicited this response. Regardless, the evidence against the defendant was substantial, and there is no evidence that this answer affected the outcome of the trial. We conclude that the defendant is not entitled to plain error relief.

As to the defendant's 404(b) argument, he did not raise a 404(b) objection or request a jury-out hearing. *See* Tenn. R. Evid. 404(b)(1) ("The court upon request must hold a hearing outside the jury's presence.") As a result, the trial court was not asked to determine that a material issue existed other than conduct conforming with a character trait. *See* Tenn. R. Evid. 404(b)(1), (2). The court also did not explicitly consider whether the probative value was outweighed by the danger of unfair prejudice, and the State did not have the opportunity to present argument on these issues. *See* Tenn. R. Evid. 404(b)(4). Accordingly, we cannot conclude that a clear and unequivocal rule of law was breached. *See State v. Jeremy Sims and Sherry Brookshire*, No. W2013-01253-CCA-R3-CD, 2015 WL 5683755, at *14 (Tenn. Crim. App. Sept. 25, 2015) (concluding that a defendant who did not object on 404(b) grounds or request a jury-out hearing was not entitled to plain error relief because the appellate court was "hampered by the inability to discern that a clear and unequivocal rule of law was necessarily breached"), *perm. app. denied* (Tenn. Jan. 19, 2016). The defendant is not entitled to any relief.

## CONCLUSION

Based on the foregoing analysis, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

12